

FILED

JAN 28 2022

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION ) | |
| OF THE UNITED STATES OF AMERICA ) | Case No. 3:20-MJ-1129 |
| FOR A SEARCH WARRANT AUTHORIZING ) | |
| THE RELEASE OF HISTORICAL ) | |
| CELL-SITE INFORMATION AND REAL-TIME ) | **(Under Seal)** |
| GEO-LOCATION INFORMATION WITH ) | |
| REGARD TO SPRINT ) | |
| TELEPHONE NUMBER (214) 783-7970 ) | |

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Christopher Slone, a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and being duly sworn, depose and state as follows:

### Introduction

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for authorization for real-time geolocation data about the location of the cellular telephone assigned call number (214)783-7970, International Mobile Subscriber Identity number 310120264287345, subscribed to by "Lebron James, 21400 W McNichols Rd., Detroit, Michigan 48219" ("TARGET TELEPHONE"), and is believed to be used by Raymond Williams, a/k/a "Bobby." The TARGET TELEPHONE is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3123(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested

warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

## Agent Background

3. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

4. I have been employed as a special agent with the FBI since 2012. My primary duties and responsibilities involve the investigation of violations of federal law including the Controlled Substance Act as found in Title 21 of the United States Code. I currently work in the Knoxville Field Office of the FBI and am assigned to the Appalachian HIDTA drug task force. During my tenure as an FBI Special Agent, I have investigated numerous crimes including, but not limited to, bank robbery, gangs and organized crimes, narcotics trafficking, money laundering, kidnapping, fugitive investigations, and national security matter crimes. I have received extensive training pertaining to narcotic investigations and the investigations of various crimes which arise from drug trafficking activities. I have become familiar with the methods, operations, and schemes commonly employed by individuals involved in the violation of narcotics statues through my training and prior experience, including previous cases I have investigated with other municipal, state, and federal agents. I have investigated many cases in the Eastern District of Tennessee and elsewhere involving violations of state and federal narcotics statues and, as a result, I have been successful in arresting and convicting numerous individuals associated with narcotics distribution. I have been involved in the execution of numerous search warrants dealing with the detection and investigation of federal narcotics violations. I have participated in federal and state wiretap

investigations and prosecutions. As a result of these investigations and prosecutions, I have become aware of various methods and techniques utilized by individuals within the Eastern District of Tennessee and elsewhere to sell and distribute controlled substances. I have become familiar with codes, slang terms, and other terminology used to refer to controlled substances by narcotics traffickers within the Eastern District of Tennessee and elsewhere. I am familiar with the operations of illegal drug trafficking organizations in various parts of the world, including the Eastern District of Tennessee in the Southeastern United States. Based on my training, experience, discussions with other law enforcement agents, and my participation in other investigations involving quantities of controlled substances, including heroin, fentanyl, fentanyl analogs and other controlled substances, I know that drug traffickers commonly use cellular telephones to facilitate their drug trafficking activities. Like most everyone else in this day and age, drug traffickers typically keep their cellular telephones on or near their person around the clock. Unlike law-abiding citizens, however, drug traffickers commonly maintain and possess multiple cellular telephones, swap out cellular telephones rather routinely (*i.e.*, discontinue use of one or more cellular telephones and replace them with new phones in hopes of evading detection by law enforcement), and sometimes allow other drug trafficking associates use their phones to conduct drug trafficking business.

5. Providers of cellular services can provide geolocation information for phones on their network. When this information is made available to law enforcement, investigations of drug trafficking groups are advanced in at least two important ways. First of all, knowing an approximate location of a particular phone greatly facilitates and enhances physical surveillance of the user of that phone and other criminal actors with whom the user associates. Moreover, officers and agents can conduct physical surveillance more conservatively, which helps protect the

covert nature of the investigation. Secondly, the availability of geolocation information enables law enforcement to monitor and log the user's movements over time and space. This provides insight into locations commonly visited by the user, which can lead to the identification of other associates, either through their association with known physical locations or by helping law enforcement prioritize and select future physical surveillance locations.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated.

**Probable Cause**

8. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) and 846, have been committed by Williams, and others, known and unknown, as explained below. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and/or will lead to the identification of individuals who are engaged in the commission of these offenses.

**Background of the Investigation**

9. Since August 2019, federal, state, and local law enforcement agencies, have been investigating the distribution of heroin, fentanyl, and/or heroin mixed with fentanyl (hereinafter "heroin/fentanyl") by a drug trafficking organization ("DTO") operating in Knoxville, Tennessee

referred to as the Vantrese DTO. The investigation has focused on Raymond Williams, a/k/a "Bobby," Kier Vantrese, and Ricardo Briggs, a/k/a "Rico," among others. Several investigative methods have been utilized throughout the investigation including the utilization of confidential source ("CS") information, controlled drug evidence purchases, and physical surveillance. Since August 2019, law enforcement officers and agents have conducted approximately eight (8) controlled purchases of suspected heroin/fentanyl from the Vantrese DTO members. Law enforcement have seized in total approximately 35 grams of heroin/fentanyl.

10. CS information provides that members of the Vantrese DTO travel from Detroit, Michigan to Knoxville, Tennessee to distribute heroin/fentanyl. DTO members stay in Knoxville long enough to deplete their heroin/fentanyl supply, return to Detroit to obtain more heroin, and return to Knoxville to continue distribution activities. In some instances, DTO members remain in Knoxville, Tennessee while a DTO member will return to Detroit, Michigan to obtain a new supply of heroin to bring back to Knoxville, Tennessee.

11. On August 6, 2019, agents with the Federal Bureau of Investigation ("FBI") and officers with the Knox County Sheriff's Office ("KCSO") conducted a controlled buy from Raymond Williams, a/k/a "Bobby." CS-1 was utilized to conduct a recorded telephone call with Williams at (313) 258-2289 to arrange the deal. CS-1 was instructed to travel to Middlebrook Pike and call when CS-1 was in the area. CS-1 drove to The Retreat Apartment complex, a place CS-1 had previously meet Williams in the past. Williams arrived in the passenger seat of a white Dodge Durango. CS-1 exited CS-1's vehicle and entered the rear passenger side of the Durango. CS-1 provided Williams with $350 of FBI drug buy funds and received 3.9 grams of suspected heroin/fentanyl from Williams.

12. On September 24, 2019, agents with the FBI conducted a controlled buy from Williams.

CS-1 was utilized to conduct a recorded telephone call with Williams at (313) 258-2289 to arrange the deal. CS-1 was instructed to meet Williams at The Cheesecake Factory, 7600 Kingston Pike, Knoxville, Tennessee. Williams arrived at the meet location in a white Dodge Durango SUV. CS-1 provided Williams with $700 of FBI drug buy funds and received approximately ten (10) grams of suspected heroin/fentanyl from Williams.

13. On October 1, 2019, officers with the KCSO conducted a controlled buy from Williams. CS-1 was utilized to conduct a recorded telephone call with Williams at (865) 200-0237 to arrange the deal. CS-1 was instructed to meet Williams at 817 4th Avenue, Knoxville, Tennessee. Williams arrived at the meet location in a white Infiniti SUV with an unknown black male as the driver. Williams instructed CS-1 to follow him to the dead end on Caswell Avenue and 3rd Avenue. CS-1 provided Williams with $350 of KCSO drug buy funds and received approximately four (4) grams of suspected heroin/fentanyl from Williams.

14. From November 2019 through March 2020, CS-1, a source jointly ran by the FBI and KCSO, lost contact with handling agents and officers and was subsequently closed as a CS. In March 2020, COVID-19 restrictions were implemented at most federal and state agencies that entailed teleworking duties that limited operational activities to include CS meets, controlled buys, and in-person investigative duties. In August 2020, KCSO obtained a confidential source (CS-2) that is in a position to conduct controlled buys from Williams. CS-2 obtained a new cellular telephone number for Williams and a plan was made to continue controlled buys from Williams.

15. On August 20, 2020, officers with the KCSO conducted a controlled buy from Williams. CS-2 was utilized to conduct a recorded telephone call with Williams at (214) 783-7970 to arrange the deal. CS-2 was instructed to meet Williams at the Sutter's Mill apartment complex. Williams arrived in a white Hyundai SUV rental vehicle. CS-2 provided Williams with $120 of KCSO drug

buy funds and received approximately one (1) gram of suspected heroin/fentanyl from Williams.

16. On September 3, 2020, officers with the KCSO conducted a controlled buy from Williams. CS-2 was utilized to conduct the drug buy. CS-2 placed an unrecorded telephone call with Williams at (214) 783-7970 to arrange the deal. CS-2 was instructed to meet Williams at his apartment, The View Apartments, 1201 Vista Ridge Way, Knoxville, Tennessee, building 1221, apartment #303. CS-2 arrived at The View Apartments, parked CS2 vehicle near building 1221, and walked to the third floor and entered apartment number 303. CS-2 provided Williams with $375 of KCSO drug buy funds and received approximately 3.5 grams of suspected heroin/fentanyl from Williams.

## Location Technical Information

17. In my training and experience, I have learned that many wireless cellular telephone service providers provide cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call

made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

## AUTHORIZATION REQUEST

18. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

19. This is a long term investigation of a sophisticated Drug Trafficking Organization that is operating in multiple states, involves the use of informants, confidential sources, judicially authorized wiretaps, surveillance, and other investigative methods. I do not anticipate that this investigation will be completed in the near future. I therefore request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the TARGET TELEPHONE would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

20. I further request that the Court direct the relevant wireless provider to disclose to the government any information described in Attachment B that is within the possession, custody, or control of the wireless provider I also request that the Court direct the wireless provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the wireless provider's services, including by initiating a signal to determine the location of the TARGET TELEPHONE on the wireless provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the wireless provider for reasonable expenses incurred in furnishing such facilities or assistance.

21. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the TARGET TELEPHONE outside of daytime hours.

Respectfully submitted,

Christopher Slone
Special Agent, FBI

Subscribed and sworn to before me on September 11, 2020.

DEBRA C. POPLIN
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A

## Property to Be Searched

1. A cellular telephone assigned call number (214) 783-7970, International Mobile Subscriber Identity number 310120264287345, subscribed to by "LeBron James, 21400 W McNichols Rd., Detroit, Michigan 48219" ("TARGET TELEPHONE"). The TARGET TELEPHONE is serviced by Sprint;

2. Records and information associated with the above Cell Phone number that is within the possession, custody, or control of the wireless provider, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

# ATTACHMENT B

## Particular Things to be Seized

### I. Information to be Disclosed by the Provider

All information about the location of the TARGET TELEPHONE described in Attachment A for a period of 60 days, during all times of day and night. "Information about the location of the TARGET TELEPHONE includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the wireless service provider, the wireless service provider is required to disclose the Location Information to the government. In addition, the wireless service provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the wireless service provider's services, including by initiating a signal to determine the location of the TARGET TELEPHONE on the wireless service provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the wireless service provider for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).